*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★        ★ ★ ★

## MEMORANDUM OPINION

No. 04-06-00375-CR

Carlos **RIVAS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2003CR10018
Honorable Mary Román, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:        Catherine Stone, Chief Justice
                 Karen Angelini, Justice
                 Steven C. Hilbig, Justice

Delivered and Filed:   July 8, 2009

AFFIRMED

Carlos Rivas was found guilty of four counts of aggravated sexual assault and one count of indecency with a child. On original submission, he argued that (1) the report of the sexual assault nurse examiner should not have been admitted in evidence because it constituted improper bolstering of the complainant's testimony; (2) the report of the nurse examiner should not have been admitted in evidence because it violated Texas Rule of Evidence 403; and (3) the trial court should have

granted his motion for mistrial because during closing argument in the punishment phase of the trial, the prosecutor characterized him as a "monster." On June 6, 2007, we issued an opinion in this case holding that (1) "bolstering" was not sufficient to preserve error for appeal; (2) the trial court did not abuse its discretion in determining that the admission of the nurse examiner's report did not violate rule 403; and (3) the State's use of "monster" was not improper argument. *Rivas v. State*, No. 04-06-00375-CR, 2007 WL 1608550 (Tex. App.—San Antonio 2007), *rev'd*, 275 S.W.3d 880 (Tex. Crim. App. 2009) (*Rivas I*). Rivas then filed a petition for discretionary review attacking only our first holding regarding preservation of error. On January 28, 2009, the Texas Court of Criminal Appeals remanded this case back to us for further consideration, holding that Rivas had made more specific objections than "bolstering" and thus had preserved error with respect to those specific objections. *Rivas v. State*, 275 S.W.3d 880, 887 (Tex. Crim. App. 2009) (*Rivas II*). Therefore, we now consider these specific objections identified by the court of criminal appeals.

### BACKGROUND

Rivas's step-daughter, C.C., testified at trial that Rivas sexually assaulted her on multiple occasions. C.C., a ten year-old-girl, testified that when she was seven years-old, Rivas touched her genitals with his hands, performed oral sex on her, and penetrated both her vagina and her anus with his penis.[1] According to C.C., Rivas made her touch herself while he masturbated, and they would then have a contest to "see who could make the white stuff come out first." C.C. also testified that Rivas made her perform oral sex on him.

---

[1] C.C. described these actions by various euphemisms ("private part," "back part," etc.); however, although C.C. used euphemisms, her testimony clearly identified the parts of the female and male bodies at issue and the actions that she claimed took place.

Detective Frederick Allen Roussel of the San Antonio Police Department's sex crimes division testified that he investigated the allegations against Rivas. When he interviewed C.C., he asked her to draw a picture to illustrate what had happened to her. According to Detective Roussel, when C.C. was unable to draw what she wanted to illustrate, she began to simulate oral sex:

> Like I said, she was unable to draw what she wanted to get across, so she knelt down on the floor and was sitting on the back of her calves. She took her hand and made kind of a fist and . . . She doubled over, leaned forward with her hand like that, and was motioning her hand up and down with her mouth open, moving her head up and down . . . .

According to Detective Roussel, he became so uncomfortable that he opened the closed door to the room: "So, I just opened the door a little bit, just because it was a little uncomfortable. I don't know exactly why I felt like I had to open the door, but I wanted the door opened. So, it was just strange seeing a seven-year-old demonstrate something like that that was fairly graphic and accurate."

Detective Roussel also testified that he interviewed Rivas. When asked on cross-examination by defense counsel what Rivas had told him, Detective Roussel testified that Rivas said the allegations were untrue and that the allegations were motivated by a custody issue over his and his wife's infant daughter, R.R.

Detective Roussel also testified that he searched the apartment where Rivas, his wife, C.C., and R.R. lived. During the search, an evidence technician, Detective Garcia, took photographs and removed the bedding from C.C.'s room. Kimberly F. Landers, a forensic scientist with the Bexar County Criminal Investigation Laboratory, conducted testing on the bedding and testified at trial that she was able to identify the presence of sperm on the blue blanket taken from C.C.'s bottom bunk bed. Robert Sailors, also a forensic scientist with the Bexar County Criminal Investigation Laboratory, performed DNA analysis on the blue blanket and compared it to Rivas's DNA sample.

According to Sailors, Rivas was not excluded as a contributor of the human DNA identified on the blanket; "[t]hat means the two genetic profiles, the one from the blanket and the one from Carlos Rivas, they matched." Because he had a match, Sailors then considered whether the match was coincidental or was a true match. Sailors determined that the profile observed on the blanket would be expected to occur in one in eighty-seven quadrillion individuals in the Southwestern Hispanic population. The profile would be expected to occur in one in every 127 quadrillion individuals in the Southeastern Hispanic population. And, the profile would be expected to occur in one in every 746 quadrillion individuals in the Caucasian population. For the African-American population, the profile would occur in one in every 16.7 quintillion individuals.

Annette Santos, a sexual assault nurse examiner at the Alamo Children's Advocacy Center examined C.C. She took a history from C.C. and performed a head-to-toe and an anal-genital examination. She noted in her medical report that the results from the examination were normal.

Rivas testified on his behalf and denied the allegations. He claimed that he and his wife had had sexual relations on the blue blanket found in C.C.'s room; that the blue blanket had been on his and his wife's bed; and that he had no idea how the blanket had found its way to C.C.'s room. Although Rivas and his wife had only been married a short time, Rivas testified that he and his wife had a stormy and argumentative relationship. According to Rivas, they had argued, and he told his wife that she could leave but could not take their infant daughter.

Rivas was subsequently found guilty of four counts of aggravated sexual assault and one count of indecency with a child. He was sentenced to twenty-five years imprisonment for the aggravated sexual assault counts and to twelve years imprisonment for the indecency with a child count, all to run concurrently.

**MEDICAL REPORT**

In its opinion, the court of criminal appeals noted that "[b]ecause of the multifarious origins of 'bolstering,' courts have found concern with it as an objection on its face." *Rivas II*, 275 S.W.3d at 887. The court then noted the following:

> Many appellate courts have cited the *Cohn* concurrence as authority to abandon "bolstering" as a valid objection to preserve error for review. A party's objection must inform the trial court why or on what basis the otherwise admissible evidence should be excluded. The Court of Appeals relied on this principle in the instant case when it held that "a general objection to 'bolstering' is not sufficient to preserve error, because it does not sufficiently inform the trial court of the nature of the objection."
>
> But the appellant's objections were not just general objection to "bolstering." We set out his objections at some length above. Several grounds other than "bolstering" were specified.
>
> One was that the medical exception to the hearsay rule did not apply in the absence of physical evidence of abuse. This was specified in the appellant's first and third objections.
>
> Another was that the evidence was inadmissible because the child had not been impeached. This was specified in the second, fourth, seventh, and ninth objections.
>
> Yet another was connected to an appellate opinion (or opinions) on which the appellant relied, which (he said) stood for the proposition that the child's statements would be used as a basis for the nurse's "back door" diagnosis or opinion that sexual abuse had occurred. This ground was made when he presented the opinions to the court and when he made his fifth, sixth, and tenth objections.

*Id.*

In his first issue, Rivas argues that "[t]he trial court erred when it overruled [his] objection and admitted into evidence the report of the sexual assault nurse examiner because the evidence constituted improper bolstering of the complainant's testimony." He then discusses the procedural history of the nurse examiner's report being admitted in evidence, noting that abuse of discretion is the appropriate standard of review on appeal. Rivas then quotes *Cohn v. State*, 849 S.W.2d 817, 819

(Tex. Crim. App. 1993), for the proposition that bolstering occurs "when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party." Rivas's entire legal analysis of the issue consists of the following:

> When a sexual abuse examination is at issue, and there is no physical evidence of abuse, the testimony of the sexual assault examiner "can only be seen as an attempt to directly bolster the credibility of the complainant and a direct comment on the complainant's truthfulness." *Salinas v. State*, 166 S.W.3d 368, 371 (Tex. App.—Fort Worth 2005, pet. ref'd).

> The line of questions to Annette Santos regarding C.C.'s declarations during the SANE exam was improper bolstering, and the actual exam report was undoubtedly bolstering also. No aspect of C.C.'s declarations had been impeached prior to the State's questions, and her declarations in the SANE examination were consistent with her prior testimony – if more detailed and complete. The questions and the report "underlined" the child's credibility to the jury, to the extent that this evidence covered items about which she had already testified. With regard to the item about which C.C. did not testify – Count II of the indictment – the evidence was still improper, because it was a comment on the child's truthfulness. *Id.* The court abused its discretion when it overruled the objection.

> The State argued at trial that the evidence was admissible as a hearsay declaration made for the purpose of medical diagnosis and treatment. TEX. R. EVID. 803(4) provides that statements made for the purpose of medical diagnosis and treatment are not excluded by the hearsay rule even though the declarant is available to testify. Appellant's counsel argued that there was no diagnosis of sexual assault and therefore the declaration was not made for the purpose of diagnosis or treatment. As stated before, there was a "Diagnostic Impressions" section of the report, and that section stated that the "normal" physical exam "[c]an be consistent with the history provided." It is argued here that this is not a diagnosis, but even if it is, it is a direct comment on the truthfulness of the complainant, and is therefore inadmissible bolstering.

Thus, Rivas relies on two legal authorities: the Fort Worth Court of Appeals' opinion in *Salinas* and Texas Rule of Evidence 803(4).

We disagree with Rivas's assertion that *Salinas* stands for the proposition that when there is no physical evidence of abuse, a sexual assault examiner may never testify. The Fort Worth Court of Appeals in *Salinas*, 166 S.W.3d at 369, dealt with the issue of whether allowing the State's expert

to testify about her diagnosis of sexual abuse, which was based solely on the self-reported medical history of the complainant, constituted a direct opinion on the credibility of the complainant. In *Salinas*, the complainant testified that the defendant had penetrated her anus with his finger. *Id.* at 370. The State's expert testified that, generally, there will be no physical evidence of the mere insertion of a finger into the anus of a six-year-old child. *Id.* Nevertheless, the expert diagnosed sexual abuse based solely upon the history provided by the complainant, noting that the medical exam was consistent with that history. *Id.* That is, the expert "diagnosed sexual abuse by digital penetration of the anus because the child told her that digital penetration had occurred and because there was no physical evidence of any sexual abuse." *Id.* The Fort Worth Court of Appeals held that such testimony was "a direct comment on the credibility of the complaining witness." *Id.* at 371. According to the court, "[b]ecause there was no physical indication of digital penetration, [the expert]'s testimony can only be seen as an attempt to directly bolster the credibility of the complainant and a direct comment on the complainant's truthfulness." *Id.* "Although [the expert] could properly testify that the physical exam was normal, the trial court abused its discretion in admitting [the expert]'s testimony that she had diagnosed sexual abuse based on the child's medical history." *Id.*

The facts of this case, however, are distinguishable. Santos's diagnostic impression was a "normal examination," which "[c]an be consistent with history provided." Unlike in *Salinas*, Santos made no diagnosis of sexual abuse. "Moreover, testimony that informs the jury that sexual abuse does not always result in physical trauma is at best neutral testimony – this fact alone does not militate in favor or against a finding of sexual abuse." *Uribes v. State*, No. 04-07-00774-CR, 2009

WL 330972, at *1 (Tex. App.—San Antonio 2009, no pet.). Santos never testified directly about C.C.'s credibility or honesty. *See id.*

Further, we disagree with Rivas's assertion that C.C.'s declarations had not been impeached before the admission of the medical report. C.C. testified before Santos and was cross-examined by Rivas, who attempted to show that C.C.'s memory of the events was not accurate, that she was jealous of her mother's relationship with Rivas and her new baby sister, and that her mother and Rivas fought a lot and were fighting on the day she outcried to her mother.[2] The whole point of the cross-examination was to show that C.C. was not telling the truth. This impeachment by Rivas, which suggested fabrication, permitted corroboration of C.C.'s testimony by Santos. *See id.*

Finally, we hold that the medical report was admissible as a statement made for the purpose of medical diagnosis or treatment. *See Uribes*, 2009 WL 330972, at *2. Texas Rule of Evidence

---

[2] Indeed, during closing argument, Rivas highlighted these points:

Let's talk a little bit about the time line in this case, ladies and gentlemen. When did this case take place? When did the outcry come? July the 25th, 2003, at the baptism of the little sister. What does she tell you? Well, she told you there was a lot of arguing in the family. What did Carlos tell you? They argued over the baby. He was attentive, but he was inattentive. There was stress. What did the little girl say? I'm sad. I went to my room. She was upset. The very same day she's going to tell you right there on that report, you know, that's State's Exhibit 23. What did she say she did? I went to my room. I withdrew. The same little girl who was left in Washington by her mother for six months, not with her natural father. Wonder why? Not with – with her stepfather, who wasn't her natural father. She comes to San Antonio, Texas, in December. . . . The little girl is taken to school. She's picked up by a school bus. Her mother meets her every day. Carlos, hard working, drives 600 miles a day. Leaves in the afternoon, comes back in the morning or late afternoon, depending on how long he takes a nap while he's on the road. The mother is there. The baby is born in March. Carlos's attention shifts. Where does the attention shift? To his only child, his firstborn. Just like all fathers, proud. . . . In a home where there is stress, in a home where there is arguing, in a home where they are fighting, who were they fighting over? A baby. Children aren't stupid, ladies and gentlemen. They know when they are fighting over a baby. And what did Carlos say? He told her, you can go, but you are not taking my baby. So, what goes through the mind of a seven year-old? Obviously, as she told you, sad, unhappy. . . . The little girl couldn't remember. And you saw her. The State was equally frustrated, ladies and gentlemen, because about the last four times, all I remember, front or back, front or back, number one, number two, because they led, led, led, led, led her. When was this, ladies and gentlemen, every time they asked her a question. What was that about? And then all of a sudden, oh, yeah, I remember now. . . . She can't remember much, except what the State asks her and tells her. Now, children are children, and the more you ask a child about something, you know, the more firm they become in their position.

803(4) provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof" are admissible as exceptions to the hearsay rule as long as they are "reasonably pertinent to diagnosis or treatment." TEX. R. EVID. 803(4). We have interpreted rule 803(4) to include statements by victims of child abuse as to the source of their alleged injuries. *See Uribes*, 2009 WL 330972, at \*2; *see also Burns v. State*, 122 S.W.3d 434, 438-39 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Santos testified that she initially takes a history for diagnosis and treatment. According to Santos, the history aids her in determining whether the patient needs testing for infection or sexually transmitted diseases. "This testimony falls squarely within rule 803(4)." *Uribes*, 2009 WL 330972, at \*2.

Finding no abuse of discretion by the trial court, we overrule Rivas's issue.

### CONCLUSION

We affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish